**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| SHARAME M. VODRASKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:10-CV-72 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Sharame M. Vodraska appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Child's Insurance Benefits ("CIB").[1] (*See* Docket # 1.) For the

following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Vodraska applied for CIB on July 17, 2006, alleging that she became disabled as of July

31, 2002. (Tr. 10, 146-47, 155.)  The Commissioner denied her application initially and upon

reconsideration, and Vodraska requested an administrative hearing.  Administrative Law Judge

("ALJ") Terry Miller conducted a hearing on June 28, 2007, at which Vodraska, who was

represented by counsel; Ms. Sharon Vodraska, the claimant's mother; Mr. James Vodraska, the

claimant's father; and Joseph Thompson, a vocational expert ("VE") testified. (Tr. 22-80.)

On April 16, 2009, the ALJ rendered an unfavorable decision to Vodraska, concluding

that she was not disabled prior to the age of 22 and was therefore not entitled to CIB. (Tr. 7-21.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

The Appeals Council denied Vodraska's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.) Vodraska filed a complaint with this Court on March 11, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.) On appeal, Vodraska argues that the ALJ improperly evaluated the credibility of her symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Br.") 19-22.)

## II. FACTUAL BACKGROUND[2]

### A. Background

Vodraska was eighteen years old on her alleged disability onset date. (Br. 2.) She had no past relevant work experience. (Tr. 12-13.) Vodraska alleges that she is disabled due to Bipolar Disorder. (Br. 2.)

### B. Summary of Relevant Medical Evidence[3]

Vodraska was admitted to the hospital in December 1998 for a mental status evaluation by Dr. Pradeep Marballi, a psychiatrist. (Tr. 247-50.) She was referred by her family physician, Dr. R. Bainbridge, who reported that she was not making sense while talking and was having difficulties sleeping. (Tr. 247, 339.) Dr. Bainbridge reported that Vodraska was speaking rapidly about political topics that did not fit together and was jumping around from topic to topic. (Tr. 247.) Vodraska's parents reported that they were concerned that her thinking had become irrational. (Tr. 247.) Vodraska's father stated that she believed that aliens were watching her and

---

[2] In the interest of brevity, this Opinion recounts only the portions of the administrative record necessary to the decision. Additionally, because Vodraska is not challenging the ALJ's findings with regard to her physical health, only the evidence related to her mental health will be discussed.

[3] In order to receive CIB, Vodraska bears the burden of demonstrating that she became disabled prior to attaining the age of 22. *See* 42 U.S.C. §§ 402(d)(1), 423(d)(1)(A); *see also* 20 C.F.R. § 404.350. Thus, she must demonstrate that she became disabled prior to August 9, 2002, the date of her 22nd birthday. (Tr. 14, 146.) Accordingly, this discussion of Vodraska's medical history is primarily limited to the relevant period of time from her alleged onset date through August 9, 2002.

that some kind of government plot was happening. (Tr. 247.)  Her parents stated that she had difficulty relating to other children, and they teased her about her appearance or because she got good grades. (Tr. 248.)  They also noted that Vodraska had been talking non-stop for a considerable period of time; that she often talked about voices; that her moods kept fluctuating up and down; and that she would often giggle and laugh for no reason. (Tr. 248.)

Dr. Marbelli noted that Vodraska was quite restless during the interview. (Tr. 249.) During the interview, she elaborated on her paranoid delusions about the government and stated that she had too many thoughts crowding her mind. (Tr. 249.)  Vodraska stated that she was hearing several voices in different foreign languages. (Tr. 247, 249.)  Dr. Marbelli noted that her mood was labile, and she ranged from being irritable to laughing for no apparent reason. (Tr. 249.)  Vodraska denied having any thoughts of wanting to hurt herself or others. (Tr. 249.)  Dr. Marbelli reported that her insight was negligible and her judgment appeared to be impulsive. (Tr. 249.)  Based on his examination, Dr. Marbelli stated that he believed Vodraska had a psychotic disorder, possibly either bipolar mood disorder or paranoid schizophrenia. (Tr. 250, 470.)  He assessed her Global Assessment of Functioning ("GAF") score as 25 at that time and 65 as the highest GAF score within the past year.[4] (Tr. 250.)  Vodraska was admitted to the hospital for inpatient treatment. (Tr. 250.)

During her hospitalization, Vodraska was treated with Navane, an anti-psychotic medication, and her symptoms cleared within a week. (Tr. 241.)  Prior to her discharge, Dr. G. L.

---

[4] A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning.  *See* Diagnostic & Statistical Manual of Mental Disorders - Text Revision 32 (4th ed. 2000).  The higher the GAF score, the better the individual's psychological, social, and occupational functioning.  A GAF Score of 25 indicates an individual whose behavior is considerably influenced by delusions or hallucinations, or has serious impairment in communication or judgment, or is unable to function in almost all areas.  A GAF Score of 65 indicates an individual that has some mild symptoms or some difficulty in social, occupational, or school functioning, but is generally functioning pretty well, and has some meaningful interpersonal relationships.

Crawley, a psychiatrist, noted that Vodraska was stable, oriented, alert, and cooperative. (Tr. 241.) At the time of discharge, she was not voicing any delusions or hallucinations. (Tr. 241.) Dr. Crawley noted that Vodraska's thought processes were orderly and coherent and she was discharged from inpatient care with prescriptions for Navane and Artane. (Tr. 241.)

In February 1999, Vodraska returned to the hospital for a mental status evaluation because she was having ongoing problems related to her psychotic disorder. (Tr. 502-04.) The attending physician noted that she was extremely psychotic and that she was unable to recount her medical history. (Tr. 502.) She found that Vodraska had very inappropriate and irrelevant speech at times. (Tr. 502.) Vodraska's parents reported that she had not been sleeping well and that she had recently lost her appetite. (Tr. 502.) Vodraska's doctors noted that she was being homeschooled, but did attend public school one hour a day for one class, and that she had been working at the public library. (Tr. 502.)

Vodraska was subsequently placed under the care of Dr. Madhu Rao for management of her psychotic disorder. (Tr. 502.) A master treatment plan was established to rule out Bipolar Disorder I, mixed with Psychotic Features. (Tr. 505.) Dr. Rao prescribed Depakote and Seroquil. (Tr. 508.) Upon discharge, it was noted that Vodraska's status was "good" and "improved." (Tr. 510.)

In March 1999, Vodraska reported that she felt good and that school was going well. (Tr. 511.) Dr. Rao noted that she had no psychosis at that time and that her mood was stable. (Tr. 511.)

In April 1999, Vodraska again told Dr. Rao that she was doing well. (Tr. 511.) Dr. Rao also noted that she was doing okay on her medications and that her mood was stable. (Tr. 511.)

Dr. Rao found that Vodraska had increased her exercise and that she was sleeping okay. (Tr. 511.)  He recommended that she continue taking her Depakote and Seroquil medications. (Tr. 511.)

In May 1999, Vodraska stated that she was doing okay, except that she had some difficulty getting up in the morning. (Tr. 512.)

Vodraska graduated from Marion High School in June 1999 with a 3.2 G.P.A. (Tr. 444.) During her July appointment with Dr. Rao, he noted that she was doing well. (Tr. 512.)  He recommended that she continue her Depakote and Seroquil medications. (Tr. 512.)

In July 1999, Vodraska reported that she was having some difficulties, but that she was able to attend a summer camp. (Tr. 513.)  Dr. Rao recommended that she decrease her Seroquil, continue Depakote, and add Wellbutrin to her medication regimen. (Tr. 513.)

In August 1999, Dr. Rao noted that the Wellbutrin medication had helped Vodraska's mood. (Tr. 513.)  He changed his diagnosis to schizoaffective disorder and recommended that she continue her medication regimen of Depakote, Seroquil, and Wellbutrin. (Tr. 513.)

During her September and October 1999 visits, Dr. Rao found that Vodraska was doing well on her medications. (Tr. 514.)  Vodraska reported that college was going well and that she was getting good grades. (Tr. 514.)  Dr. Rao also believed that Vodraska's sleep habits and mood were improving. (Tr. 514.)

In December 1999, Vodraska told Dr. Rao that she felt depressed over the Thanksgiving break, but that she was feeling better after returning to school. (Tr. 514.)  Dr. Rao recommended that Vodraska continue her current medication regimen. (Tr. 514.)

In January 2000, Vodraska reported that she had a good Christmas and that things were

going well. (Tr. 515.)  Similarly, in February 2000, she told Dr. Rao that she had been having

some headaches over the past week, but was otherwise doing well. (Tr. 515.)  Dr. Rao again

instructed Vodraska to continue her current medications. (Tr. 515.)

Vodraska saw Dr. Rao again in March 2000 and reported that she was doing well. (Tr.

540.)  In June 2000, she stated that things were going okay in school and that she had secured a

job. (Tr. 540.)  She was, however, concerned about her recent weight gain. (Tr. 540.)  Dr. Rao

recommended that she add Topamax to her current regimen of Depakote, Seroquil, and

Wellbutrin to help her loss weight. (Tr. 540.)

In July 2000, Vodraska informed Dr. Rao that she had a decreased appetite with

Topamax, but had not seen much weight loss and had also been slightly more agitated over the

last month. (Tr. 539.)  Dr. Rao continued her current medications. (Tr. 539.)

In August 2000, Vodraska stated that she was doing well. (Tr. 537.)  She reported that

she was attending college from 9 a.m. to 5 p.m. during the week. (Tr. 537.)  Dr. Rao noted that

Vodraska was losing weight with Topamax and exercise and he instructed her to continue taking

her medications. (Tr. 537.)

Vodraska returned to Dr. Rao in November 2000 and informed him that she was having

some problems sleeping, but was otherwise doing well. (Tr. 537.)  Dr. Rao noted that she

continued to lose some weight. (Tr. 537.)

In December 2000, Vodraska reported that she had gone into depression in November,

and her ability to concentrate, along with her grades, had decreased. (Tr. 536.)  Dr. Rao noted

that Vodraska was otherwise doing well on her medications and instructed her to continue the

same regimen. (Tr. 536.)

In March 2001, Vodraska informed Dr. Rao that she was doing well, but she stated she wanted to stop taking Depakote because of weight gain. (Tr. 535.) She also reported some social anxiety, which caused her to drop a college speech class. (Tr. 535.) Dr. Rao recommended that Vodraska decrease her dosage of Depakote and add Xanax to treat her anxiety symptoms. (Tr. 535.)

In May 2001, Vodraska reported that she was doing well and that her summer break from college had just started. (Tr. 534.) Dr. Rao instructed her to continue her current medication regimen. (Tr. 534.)

Vodraska next saw Dr. Rao in June 2001 and again stated that she was doing well. (Tr. 534.) She informed him that she had recently met with a career counselor at Ivy Tech Community College, had taken a career aptitude test, and was considering becoming a surgical technician or a registered nurse. (Tr. 534.) Dr. Rao found that her medications were working well. (Tr. 534.)

In August 2001, Vodraska again discussed her potential career in the nursing profession with Dr. Rao. (Tr. 533.) Dr. Rao told her that he thought nursing would suit her temperament. (Tr. 533.) Vodraska did not report any problems at that visit. (Tr. 533.)

In October 2001, Vodraska reported having some difficulties, which Dr. Rao found could be secondary to her medications. (Tr. 533.)

Vodraska was also seen by Dr. R. Clark Perry, an endocrinologist, in December 2001 for a consultation on her hypothyroidism. (Tr. 266-68.) Dr. Perry noted that she had been diagnosed with hypothyroidism six years prior and her primary care physician had treated her with Levoxyl. (Tr. 266.) Vodraska admitted that she sometimes missed taking two or three pills of

her monthly dose of Levoxyl. (Tr. 266.)  She reported that, overall, she felt reasonably well and that her energy level was quite normal. (Tr. 266.)  Upon testing, Dr. Perry noted that Vodraska was mildly under-replaced in terms of thyroid hormone and he therefore increased her dosage of Levoxyl and encouraged her to be more compliant with medication. (Tr. 267-68.)

In December 2001, Vodraska told Dr. Rao that she was regularly taking her medications and that she felt well. (Tr. 532.)  Dr. Rao instructed her to continue taking her prescribed medications. (Tr. 532.)

Vodraska returned to Dr. Rao in February 2002 and stated that she was feeling good overall and that she was making new friends. (Tr. 531.)  In February 2002, Vodraska also returned to Dr. Perry for a follow-up visit for her hypothyroidism. (Tr. 264-65.)  She informed him that she had obtained a pill box to remind her to take her thyroid medication and that this had considerably helped her compliance. (Tr. 264.)  She stated that she felt somewhat better and that her energy had increased since her previous appointment. (Tr. 264.)  She denied having any nervousness, tremors, or palpitations. (Tr. 264.)

In May 2002, Vodraska reported that she was having some problems with medication compliance. (Tr. 530.)  Dr. Rao noted that she had missed her previous appointment. (Tr. 530.)  Vodraska stated that she tended to do poorly during the springtime and that she had been missing tests, having attendance problems, and failing classes. (Tr. 530.)

In her July 2002 appointment with Dr. Rao, Vodraska acknowledged that she was doing better and that she was currently looking for a job. (Tr. 530.)  Dr. Rao instructed her to continue her current medications. (Tr. 530.)

In August 2002, Vodraska reported that she was experiencing some anxiety symptoms

because of job interviews. (Tr. 529.)  She stated that her mood, sleep, and affect were okay and that she had been compliant with her medications. (Tr. 529.)

On August 9, 2002, Vodraska turned 22 years old. (Tr. 14, 146.)

In September 2006, Dr. Donna Unversaw, a state agency reviewing psychologist, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form. (Tr. 481-94, 495-97.)  Dr. Unversaw opined that Vodraska had mild difficulties in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation during the relevant time period. (Tr. 491.)  Dr. Unversaw also found that Vodraska was not significantly limited in any aspect of understanding and memory, sustained concentration and persistence, social interaction, or adaptation during the relevant time period. (Tr. 495-96.)  Dr. Unversaw noted that, during the relevant time period, the medical evidence reflected that Vodraska had good overall control of her impairment with medication and that she was functioning at a good level. (Tr. 497.)  She further noted that Vodraska was able to attend Ivy Tech Community College and to maintain employment during the relevant time period. (Tr. 497.)  Dr. Unversaw opined that, during the relevant time period, Vodraska was able to complete simple, repetitive tasks despite her mental impairment. (Tr. 497.)  Dr. J. Gange, another state agency reviewing psychologist, affirmed Dr. Unversaw's opinion in January 2007. (Tr. 522.)

*C. Vodraska's Hearing Testimony*

On October 22, 2008, Vodraska appeared with counsel and testified before the ALJ. (Tr. 22-80.)  Vodraska testified that, during the relevant time period, she attended Indiana Wesleyan for two years and then transferred to Ivy Tech Community College, which she attended for two

more years. (Tr. 30-31.)  During her second year at Indiana Wesleyan, she worked in an office for about one year as part of a work study program. (Tr. 31-32.)  She testified that when she worked at Wesleyan she initially performed satisfactorily, and was given more responsibility. (Tr. 38.)  She then stated, however, that she later began to have problems arriving on time and that the quality of her work decreased. (Tr. 38.)

During that time, she was also a member of the Drama Ministry team, which involved traveling to perform skits and to participate in outreach ministry activities. (Tr. 50-51.)

Vodraska testified that she stopped attending college in 2002 because she had to withdraw from too many classes as a result of problems with the instructor, problems with her bipolar disorder and depression, and financial constraints. (Tr. 32-33.)  She stated that her Seroquel made her groggy during the day, such that she had trouble paying attention in morning classes. (Tr. 47.)

Vodraska stated that the primary conditions that limited her ability to work were bipolar disorder, schizoaffective disorder, and borderline personality disorder. (Tr. 45.)  She testified that as a result of these conditions, she sometimes had trouble remembering directions to where she was going and had some trouble with school work during the relevant time period. (Tr. 46.)  She alleged that she would try to work on too many homework projects at once when she was manic, but that she did not want to study at all when she was depressed. (Tr. 46.)  She testified that she would sometimes miss classes and that she had some difficulties dealing with other people. (Tr. 49-50.)  Vodraska claimed that she sometimes had trouble focusing because of the side effects of her medications. (Tr. 47.)  She also stated that she did not have very many close friends, and her relationships with friends and family were difficult. (Tr. 49.)

Vodraska testified that when she was depressed she was very tired and tended to withdraw, isolate herself, and sleep. (Tr. 59.)  She also reported that she frequently put things off and procrastinated. (Tr. 59.)  She would also miss appointments, not go to class, or forget to call in for work. (Tr. 59.)  She stated that she really did not have any interest in hobbies or activities when she was depressed. (Tr. 59.)  She further testified that she occasionally experienced quick fluctuations between mood swings, which lasted between one and six months, and that sometimes she would overspend and have problems with finances. (Tr. 59, 61.)  She testified that she would get wild and grandiose ideas, such as thinking that it was a good time to take a trip or join a new organization. (Tr. 61.)

Vodraska testified that her medications helped her mental health conditions. (Tr. 49.)  She stated that the Wellbutrin and Depakote helped with the depression and to even out her moods overall. (Tr. 49.)  She also reported that the Seroquil helped with the delusions and hallucinations that she had at the time of her first outbreak. (Tr. 49.)

Vodraska also stated that during the relevant time period, her activities of daily living included getting up, caring for her personal hygiene, having breakfast, driving a car by herself, going to class, doing homework, going to the computer lab, running errands, visiting with her parents, doing chores around the house, reading books, watching television, doing some shopping, attending church, and going to the movie theater. (Tr. 53-58.)

Ms. Sharon Vodraska, the claimant's mother, testified about her daughter's hospitalization in December 1998. (Tr. 64-65.)  Ms. Vodraska testified that Dr. Rao placed her daughter on medications that evened her out, made her more personable, and improved her functioning. (Tr. 65.)  Ms. Vodraska also testified that, while at college, her daughter had

difficulties staying in a daily routine, maintaining concentration, and keeping up with her assignments. (Tr. 66). She reported that her daughter went through depressive and manic periods while in college. (Tr. 67.)

Mr. James Vodraksa, the claimant's father, also testified that his daughter experienced problems with anxiety while attending college. (Tr. 72.) He stated that she had problems with her performance and the quality of her work at all of the jobs she held. (Tr. 73.)

Finally, Joseph Thompson, the VE, testified about what types of work Vodraska may be able to perform. (Tr. 74-78.) The ALJ asked the VE to consider a hypothetical individual with Vodraska's age, education, and work history, who is limited to simple, routine tasks that were not fast-paced or had strict production requirements. (Tr. 76.) The ALJ also instructed the ALJ to consider that the individual could only have brief and occasional interactions with others and would work best alone or in small groups. (Tr. 76.) The VE testified that such an individual could not perform any of Vodraska's past work, but could work as a janitor (2000 regional jobs and 20,000 jobs state-wide), in food preparation (2500 regional jobs and 25,000 jobs state-wide), and as a folder (500 regional jobs and 5000 state-wide). (Tr. 76-77.)

The VE then stated that if the ALJ were to find the testimony of Vodraska and her parents entirely credible, then Vodraska would be unable to maintain employment. (Tr. 77-78.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

This matter involves the claimant's application for Child's Insurance Benefits ("CIB") under Section 202(d) of the Social Security Act ("the Act"), 42 U.S.C. § 402. In order to receive CIB as a disabled adult, a claimant must show that she is the child of an individual that is entitled to old-age or disability insurance benefits and is dependent on the insured, is unmarried, and was under a disability as defined in the Act before she attained the age of 22. *See* 42 U.S.C. §§ 402(d)(1), 423(d)(1)(A); *see also* 20 C.F.R. § 404.350. Here, the only issue is whether Vodraska was under a disability before the age of 22.

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On April 16, 2009, the ALJ rendered his decision. (Tr. 7-21.) He found at step one of the five-step analysis that Vodraska had not engaged in substantial gainful activity since her alleged

---

[5] Before performing steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC")—the tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 416.920(e).

onset date of December 16, 1998. (Tr. 12.)  At step two, he determined that prior to age 22 Vodraska had the following severe impairments: bipolar disorder with a history of psychotic episodes, depression, and anxiety; hypothyroidism; and obesity. (Tr. 13.)  At step three, he determined that prior to age 22, Vodraska did not have an impairment or combination of impairments that was severe enough to meet a listing. (Tr. 15.)  Additionally, the ALJ determined that Vodraska had the RFC to perform light work, with no exposure to temperature extremes, loud noise, or excessive background noise.  The ALJ also limited her to simple, routine, and repetitive tasks with no fast-paced or strict production requirements and only occasional or brief interaction with others. (Tr. 16.)

The ALJ found at step four that Vodraska had no past relevant work. (Tr. 19.)  At step five, he concluded that there are a significant number of jobs in the national economy that Vodraska could perform, such as a janitor, a food preparation worker, and a folder. (Tr. 20.)  He therefore concluded that Vodraska was not under a disability at any time prior to the age of 22, and her claim for benefits was denied. (Tr. 20.)

### D.  The ALJ's Credibility Determination Will Not Be Disturbed.

Vodraska offers several reasons why the ALJ improperly evaluated the credibility of her symptom testimony.  Vodraska's arguments are ultimately unpersuasive and do not warrant a remand of the ALJ's decision.

An ALJ must follow a two-step process when evaluating a claimant's own description of her impairments. *See* 20 C.F.R. § 404.1529; *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); SSR 96-7p.  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (that is, an impairment that can be shown by

medically acceptable clinical and laboratory diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 416.929; *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); SSR 96-7p. If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see also* 20 C.F.R. § 416.929(c); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Williams*, 915 F. Supp. at 964. "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."[6] SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

---

[6] When making a credibility determination, the ALJ may not reject a claimant's statements concerning her symptoms solely on the ground that they are not substantiated by objective medical evidence. 20 C.F.R. § 404.1529; *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994). Rather, the ALJ must consider, in addition to the objective medical evidence, the entire case record to determine whether the claimant's statements are credible. *Luna*, 22 F.3d at 691. "Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. *Id.*; *see also* 20 C.F.R. § 404.1529(c).

logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . .").

The ALJ devoted several pages of his decision to a comprehensive account of Vodraska's medical history following her December 1998 hospitalization. (Tr. 13-15.) At nearly every step, after discussing her complaints, the ALJ noted that Vodraska's condition appeared to be stable with medication. The ALJ later devoted an additional page to discussing the testimony of Vodraska and her parents and contrasting her complaints of disabling limitations with the medical evidence, showing how her bipolar disorder improved and stabilized with treatment. (Tr. 17-18.) For example:

> The undersigned finds that the alleged severe and debilitating nature of the claimant's subjective complaints prior to her attaining age 22 is not fully credible or fully supported by the evidence of record. The claimant had a psychotic episode in December 1998 (when she was age 18) and had clearing of symptoms after being started on medication. She had another hospitalization in February 1999, and eventually recovered from this episode also. She graduated from high school in June 1999 and began college courses in the fall of 1999. In October 1999, Dr. Rao reported that school (college) was going well for the claimant and that she was getting good grades. She was doing well on medications. It was reported in June 2000 that she had gotten a job. Progress notes mention that claimant experienced a depressive episode in November 2000, but shortly thereafter with medication management she was doing okay. On December 19, 2001, claimant stated to Dr. Rao that "healthwise and mentally I am well." . . . Prior to her attaining age 22, the medical evidence does not show prolonged periods of deterioration or additional medical difficulties. . . .

(Tr. 17-18.)

The ALJ also considered Vodraska's appearance at the hearing and noted that "[t]here

was no apparent nervousness or cognitive difficulties, she had good memory, was polite, respectful, and cooperative, and totally oriented to her surroundings." (Tr. 18.)

Vodraska now argues, however, that the ALJ committed legally reversible error when he evaluated her credibility. Specifically, she argues: (1) that the ALJ erred when he noted that she appeared mentally sound during the hearing; (2) the ALJ did not understand the episodic nature of bipolar disorder; (3) the opinions of the State Agency physicians that the ALJ used to support his credibility determination were not supported by the record; and (4) that although the medical evidence does not show prolonged periods of deterioration, that is not inconsistent with the short episodes of depression about which Vodraska and her parents testified. (Br. 19-23.) Vodraska's arguments are unpersuasive and do not warrant a remand of the ALJ's decision.

Vodraska first takes issue with the ALJ's observation of her appearance and demeanor during the hearing. Summarily citing *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006), Vodraska broadly argues that the ALJ's observation indicates a lack of understanding of bipolar disorder. As Vodraska is forced to acknowledge, however, the ALJ is permitted to use observations made during the hearing when determining credibility. SSR 96-7p. Furthermore, Vodraska misunderstands the Seventh Circuit's holding in *Kangail*. In that case, the Court found that the ALJ had erroneously determined that the medical witnesses contradicted themselves when they testified that the claimant's mental illness was severe, yet nevertheless observed that she had behaved normally during her office visits. 454 F.3d at 629. The Court held that there was no contradiction because bipolar disorder is episodic and, therefore, the lack of observable symptoms at an appointment did not necessarily indicate that the claimant's bipolar disorder was not severe. *Id*.

Here, by contrast, the ALJ did not discount the opinion of a medical source by noting that Vodraska was behaving normally at the hearing. Rather, it appears that the ALJ commented on Vodraska's demeanor during the hearing to reinforce his finding that "[p]rior to her attaining age 22, the medical evidence does not show prolonged periods of deterioration or additional medical difficulties." (Tr. 18.) Indeed, the ALJ drew "an accurate and logical bridge," *Ribaudo*, 458 F.3d at 584; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), between the lack of medical evidence showing prolonged periods of deterioration and his finding that Vodraska's testimony of a total inability to work was not entirely credible. Because the ALJ's decision is grounded in the record and he articulated his analysis of the evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002, his decision will not be disturbed. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (stating that an ALJ is entitled to make reasonable inferences from the evidence of record).

Vodraska also summarily claims that the ALJ did not understand the episodic nature of bipolar disorder. Her second argument fares no better than her first because the ALJ's discussion of the medical evidence clearly reflects that the ALJ understood the episodic nature of her bipolar disorder. (Tr. 15-19.) Indeed, the ALJ explicitly referred to instances of "depressive episodes," "depressed periods," and "manic episodes" in his decision (Tr. 14, 17), and in discussing Vodraska's RFC, the ALJ explicitly stated that she "could not handle any fast paced or strict production requirements, and she could only have occasional and brief interactions with others and would work best alone or in small groups, to accommodate any bipolar, depression and anxiety episodes she may experience." (Tr. 19.) The ALJ further noted that "[t]hese above noted work-related mental limitations would eliminate as much work stress as possible if she had

a particular bad episode due to her bipolar condition." (Tr. 18.)  The mere fact that the ALJ

found that the medical evidence did not demonstrate that Vodraska's bipolar disorder was

disabling does not indicate that he failed to understand the episodic nature of bipolar

disorder.  The ALJ's reasoning cannot be said to be "patently wrong," *Powers,* 207 F.3d at 435,

and since the ALJ's decision is grounded in the record and he articulated his analysis of the

evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002, his decision will not be disturbed.

Vodraska next argues that the ALJ should not have relied on the medical opinions of the

State Agency psychologists to support his credibility finding because the State Agency opinions

are themselves not supported by the record.  For example, Vodraska argues that the State

Agency physicians found that her job at Ivy Tech constituted Substantial Gainful Activity

("SGA"), whereas the ALJ determined that it was not.  Similarly, she claims that she had

problems with her bipolar disorder while attending Ivy Tech and left, at least in part, because of

those problems.

Vodraska's third argument is also unsuccessful.  Although Vodraska is correct that the

ALJ found that her work at Ivy Tech was not SGA, whereas the State Agency psychologists

thought it was, the ALJ did not err in still considering the opinions.  Indeed, the ALJ noted that

the opinions were "generally supported" and apparently rejected the State Agency finding that

Vodraska had worked at SGA—in essence, making a finding that is favorable to Vodraska.

Vodraska's remaining complaints about the State Agency opinions, as with most of her other

arguments, amount to little more than a plea for this Court to re-weigh the evidence.  However,

Vodraska's disagreement with the weight given by the ALJ to the evidence is not a basis for

remand. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *Flener ex rel. Flener v.*

*Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004); *Powers*, 207 F.3d at 435. The ALJ is in the best position to evaluate the credibility of a witness, and the Court gives special deference to his determination. *Powers,* 207 F.3d at 435. Indeed, the ALJ's reasoning cannot be said to be "patently wrong," *id.*, and the Court will not re-weigh the evidence in the hope that it will come out in Vodraska's favor this time. *See Flener*, 361 F.3d at 447; SSR 96-7p.

Finally, Vodraska argues that, although the medical evidence did not show prolonged period of deterioration, the medical evidence was not inconsistent with the type of short episodes of depression that she and her parents described in their testimony. This argument, however, again amounts to little more than an unsuccessful plea for this Court to reconsider the evidence. *See Clifford*, 227 F.3d at 869. Indeed, the ALJ examined the medical evidence of record, which does not show prolonged periods of deterioration during the relevant period, and therefore rejected Vodraska's conflicting testimony. The ALJ was not "patently wrong" to do so, *Powers*, 207 F.3d at 435; *Carradine*, 360 F.3d at 754, and the Court will not accept Vodraska's invitation to remand the case in the mere hope that the same evidence will be viewed in a more favorable light. *See Flener*, 361 F.3d at 447; SSR 96-7p.

In sum, the ALJ has built an accurate and logical bridge between the evidence and his conclusion, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter judgment in favor of the Commissioner and against Vodraska.

SO ORDERED.

Enter for May 25, 2011.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge